511 S.E.2d 48

**D. Carroll GARRIS, Respondent/Appellant,**

v.

**The GOVERNING BOARD OF the SOUTH CAROLINA REINSURANCE FACILITY and the South Carolina Reinsurance Facility, Appellants/Respondents.**

No. 24871.

Supreme Court of South Carolina.

Heard Nov. 4, 1998.
Decided Dec. 29, 1998.
Rehearing Denied March 5, 1999.

434

Insurance - 1:16

Thomas C. Salane of Turner, Padget, Graham & Laney, P.A., Columbia, for Appellants/Respondents.

Thornwell F. Sowell of Sowell, Todd, Laffitte, Beard & Watson, L.L.C., Columbia; and Jeffrey A. Jacobs of Nelson Mullins Riley & Scarborough, L.L.P., Columbia, for Respondent/Appellant.

WALLER, Justice:

This appeal follows the circuit court's reversal of the decision of the Board of Governors (the Governing Board) of the South Carolina Reinsurance Facility (Facility) to revoke D. Carroll Garris's (Garris) status as a designated agent. We affirm in part, reverse in part, and remand for further proceedings.

### FACTS

Garris, a licensed insurance agent, is a designated agent of

Facility.[1] Prompted by an audit performed by one of Facility's servicing carriers, Facility began investigating allegations of underwriting irregularities at Garris's agency in mid-1993. Facility issued a notice of hearing and rule to show cause seeking to revoke Garris's status as a designated agent in December 1993. Facility alleged Garris had improperly classified private risks as commercial risks (which have lower premiums that are not subject to recoupment fees), insured "phantom" vehicles, wrote duplicate coverages, endorsed policies to insure additional vehicles after a policy had been canceled, and violated trust accounting procedures.

The Governing Board voted in November 1994 to revoke Garris's status as a designated agent. Garris petitioned the circuit court for review. The circuit court, following additional discovery, reversed the Governing Board's decision in November 1997. Both parties now appeal the circuit court's decision.

## ISSUES

1. Did the circuit court err in ruling that Governing Board members who voted to revoke Garris's status as a designated agent acted as prosecutor and adjudicator in violation of Article I, Section 22 of the state constitution?

2. Did the circuit court err in ruling that the doctrine of res judicata bars Garris's argument about the composition of the Governing Board?

3. If res judicata does not bar Garris's argument, did the circuit court err in ruling that the composition of the

1. Facility is an unincorporated, nonprofit entity created by statute in 1974 to provide high-risk drivers with automobile insurance not available through the voluntary market. Facility imposes recoupment charges, based upon a person's' driving record, upon all drivers to recover its losses. In addition to high-risk drivers ceded to Facility by voluntary insurers, Facility authorizes designated agents such as Garris to sell policies offered by servicing carriers to high-risk drivers.

Facility will cease to operate in its present form by 2006 under the new system of automobile insurance the Legislature enacted in 1997. See S.C.Code Ann. §§ 38-77-510 to -630 (1989 & Supp.1997). Facility on March 1, 1999, will stop accepting new policies written by designated agents. Designated agents may continue to earn commissions on renewals of existing policies until 2002. S.C.Code Ann. §§ 38-77-590 to -595 (Supp.1997).

Governing Board violates Article III, Section 1 of the state constitution?

4. Did the circuit court err in ruling that proxies were properly exercised and a quorum was present at Garris's hearing before the Governing Board?

## 1. ARTICLE I, SECTION 22

The circuit court reversed the Governing Board's decision to revoke Garris's status as a designated agent, finding the procedure followed by Facility unconstitutional. Under the state constitution, a person shall not "be subject to the same person for both prosecution and adjudication." S.C. Const. art. I, § 22.[2] Facility now argues the circuit court erred for three reasons.

## A. FACILITY IS AN ADMINISTRATIVE AGENCY

■ Facility contends it is a private organization that merely acts as a statutory agent for the automobile insurance industry. Facility argues it receives no state funding, has no rule-making authority, and is subject to regulation by a state agency, the South Carolina Department of Insurance. Consequently, Facility argues it is not an "administrative agency" for purposes of Article I, Section 22 under the statute creating it or the Administrative Procedure Act (APA), S.C.Code Ann. §§ 1–23–10 to –660 (1986 & Supp.1997). We disagree.

An agency "means each state board, commission, department, executive department or officer, other than the legislature or the courts, authorized by law to make regulations *or* to determine contested cases." S.C.Code Ann. § 1–23–10(1) (1986) (emphasis added); *accord* S.C.Code Ann. § 1–23–310(1) (Supp.1997) (agency "means each state board, commission, department or officer, other than the legislature or the courts,

---

2. Section 22 states, in full:

No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard; nor shall he be subject to the same person for both prosecution and adjudication; nor shall he be deprived of liberty or property unless by a mode of procedure prescribed by the General Assembly, and he shall have in all such instances the right to judicial review.

but to include the Administrative Law Judge Division, authorized by law to determine contested cases"). It is true that Facility, a statutory creature, "is subject to regulations and orders promulgated by the director [of the Department of Insurance] or his designee." S.C.Code Ann. §§ 38–1–20(16) and 38–77–510 (Supp.1997).

Facility clearly possesses rule-making authority in the area of automobile insurance, a subject that touches the life of most South Carolinians. *See* S.C.Code Ann. § 38–77–520 (Supp. 1997) (every automobile insurer in South Carolina is bound by Facility's plan of operation as approved by the director of the Department of Insurance and by rules lawfully prescribed by Facility's Governing Board); S.C.Code Ann. § 38–77–596 to –610 (Supp.1997) (Facility must calculate and file recoupment fees that are assessed on all automobile insurance policies in South Carolina, and changes in rates are subject to public hearing pursuant to APA). *See also Garris v. Governing Board of South Carolina Reinsurance Facility,* 319 S.C. 388, 461 S.E.2d 819 (1995) (applying APA to remand case for failure to exhaust administrative remedies); *Moore v. South Carolina Reinsurance Facility,* 297 S.C. 276, 376 S.E.2d 510 (1989) (applying APA in deciding whether Facility properly refused to certify each of designated agent's existing locations); *Grain Dealers Mut. Ins. Co. v. Lindsay,* 279 S.C. 355, 306 S.E.2d 860 (1983) (upholding Facility's power to enact rules regarding the distribution of Facility losses); *Mungo v. Smith,* 289 S.C. 560, 347 S.E.2d 514 (Ct.App.1986) (applying APA to decide that designated agent's status may not be revoked arbitrarily, but must be based upon substantial evidence); S.C.Code Ann. § 38–77–510 (Supp.1997) (designating Facility as a "using agency," which is defined as "any governmental body of the State which utilizes any supplies, services, or construction purchased" under state Procurement Code).

Facility has the authority to assign the status of designated agent to an individual, as well as the authority to revoke that designation. S.C.Code Ann. §§ 38–77–590 to –595 (Supp. 1997). Facility argues it does not decide "contested cases" as such cases are defined in the APA. *See* S.C.Code Ann. § 1–23–310(2) (Supp.1997) (contested case "means a proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties or privileges of a

party are required by law to be determined by an agency after an opportunity for hearing"). Nevertheless, Facility assured Garris during the course of its investigation that "a full contested type hearing will be offered to you at which time your response can be as full and complete as you deem appropriate." Facility concedes in its brief that, while it does not believe it is an administrative agency, it "has no objection to following due process standards applicable under the APA in all hearings before the Board."

■ We have interpreted Section 1–23–310(2) to mean that a "contested case"is one in which an agency is required by law to determine a party's rights after an opportunity for a hearing. *League of Women Voters of Georgetown County v. Litchfield–by–the–Sea,* 305 S.C. 424, 426, 409 S.E.2d 378, 380 (1991); *Triska v. Dep't of Health and Envtl. Control,* 292 S.C. 190, 196, 355 S.E.2d 531, 534 (1987). No statute explicitly requires Facility to hold a hearing before revoking an agent's status as a designated agent; therefore, Garris's case is not a "contested case" as defined in the APA.

However, we also have held that Article I, Section 22 requires an administrative agency to give procedural due process to parties that come before it even though a matter may not be a "contested case" as defined in the APA. *See League of Women Voters of Georgetown County, supra* (finding that certification process as outlined in then prevailing statutes and regulations was not a "contested case" as defined in APA, which meant League was not entitled to a hearing under APA; but concluding League was entitled to notice, a hearing, and judicial review under Article I, Section 22); *Stono River Envtl. Protection Ass'n v. South Carolina Dep't of Health and Envtl. Control,* 305 S.C. 90, 93, 406 S.E.2d 340, 342 (1991) (stating same principle).

We affirm the circuit court's ruling and hold that Facility is an administrative agency because it meets the rule-making component of the APA definition. *See Mungo v. Smith, supra* (where a statute contains two clauses which prescribe its applicability and the clauses are connected by the disjunctive "or," application of the statute is not limited to cases falling within both clauses, but applies to cases falling within either). Accordingly, Facility must comply with the procedural due

process protections established in Article I, Section 22 even though Garris's case is not a "contested case" as defined in the APA.

## B. SAME PERSONS AS PROSECUTOR AND ADJUDICATOR

■ Facility argues the "same persons" were not engaged in both the prosecution and adjudication of Garris's case. We disagree.

The Governing Board oversees Facility operations by considering matters in various committees, which make recommendations to other committees and the Governing Board. Governing Board member James Lingle was present as a member at an Audit Committee meeting October 20, 1993. Governing Board members Jim Thompson, Clark Hobbie, Thomas Kepley, C.M. Dinwiddie, and Frank Lee were present as observers at the meeting. Larry Griner, who is not a Governing Board member but ultimately exercised another member's proxy and voted on the Garris matter, also was present as an observer. Garris was not present or represented at the meeting.

At that meeting, a Facility auditor who had examined Garris's records and practices reported her findings in detail. The Audit Committee, following a "lengthy discussion," unanimously voted to refer the matter the Designated Agent Committee, the Operating Committee, and the state Department of Insurance.

Governing Board members Jim Thompson, Robert Herlong, Phillip Love, Thomas Reichard, and Arthur Ivey were present as members at an Operating Committee meeting October 29, 1993. Governing Board members Steve Dennis, Hobbie, Randall Thompson, and Lee were present as observers at the meeting. Non-member Griner again was present as an observer. Garris was not present or represented at the meeting.

At that meeting, a Facility official discussed the auditor's report on Garris, called members' attention to the auditor's written report that was attached as an exhibit to the agenda, and described the Audit Committee's earlier motion. Committee members discussed the Garris matter in executive session.

Governing Board members Hobbie, Kepley, and Lee were present as members at a Designated Agent Committee meeting December 13, 1993. Non-member Griner again was present as an observer. Garris appeared and answered the committee's questions.

At that meeting, the committee discussed the matter in executive session, then had a "lengthy discussion" about it in open session. The committee voted unanimously to recommend that the Governing Board revoke Garris's status as a designated agent. The committee further recommended that the Governing Board hold a special meeting to consider the matter. Facility served a notice and rule to show cause upon Garris on December 20, 1993, requiring him to appear before the Governing Board.

Of the members named above, Dennis, Jim Thompson, Herlong, Hobbie, and Love attended the three-day hearing on the Garris matter in August 1994. All voted in favor of revoking Garris's status as a designated agent on November 21, 1994. Non-member Griner also attended the hearing as the holder of Randall Thompson's proxy. Griner exercised the proxy to vote in favor of revoking Garris's status. The Governing Board voted 8–2 to revoke Garris's status.

Reichard and Lee also attended the entire hearing. Reichard did not vote because Garris was a designated agent of his company. *See* S.C.Code Ann. § 38–77–585 (Supp.1997) (prohibiting member from voting on any issue materially affecting the member's employer). Lee recused himself because he had considered the matter in committee. Lee also was chairman of the Designated Agent Committee at the time, and had referred the Garris matter for investigation as early as May 1993 after hearing reports of underwriting irregularities at Garris's agency. Lee testified the purpose of the Designated Agent Committee meeting was to gather information about Garris's case.

Kepley did not attend the hearing but gave his proxy to Love, instructing him before the hearing to vote to revoke Garris's status. Love refused to accept the proxy in that fashion, so Kepley gave him an unconditional proxy.[3]

---

3. Kepley's proxy was not exercised because Governing Board Chairman John Richards did not allow any board member to exercise the proxy of

The bottom line is that five Governing board members and one non-member attended, as a member or observer, one or more committee meetings at which the Garris matter was discussed extensively in open and executive sessions. All six voted to revoke Garris's status as a designated agent. Of those six, four (Jim Thompson, Herlong, Hobbie, and Love) were members of the committees which considered the Garris matter. In addition, two other Governing Board members attended one or more committee meetings and the entire hearing, but did not vote.

Facility now contends the circuit court erred in finding the procedure unconstitutional because none of the committee *members* —except Hobbie—voted or participated in the hearing. The Governing Board would have revoked Garris's status even without Hobbie's vote, Facility argues. Facility addresses only the Audit and Designated Agent Committee meetings in its brief. At oral argument, Facility dismissed the Operating Committee meeting as irrelevant because no vote was taken.

The court may reverse or modify the decision of an administrative agency when an appellant's substantial rights have been prejudiced because the agency's findings, inferences, conclusions, or decisions are, among other things, in violation of constitutional or statutory provisions, or made upon unlawful procedure. S.C.Code Ann. § 1–23–380(A)(6) (Supp.1997).

■■■ "[A] fair trial in a fair tribunal is a basic requirement of due process, [and] [t]his applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 723 (1975) (upholding process in which state medical board suspended physician's license after investigating and hearing the case). The fact that investigative, prosecutorial, and adjudicative functions are performed within the same agency, or even performed by the same persons within an agency, does not, without more, constitute a violation of due process. "That is not to say that there is nothing to the argument that those

another member who was not present for the entire hearing. Richards did allow non-board members (Griner and Nancy Coombs) to exercise their proxies in the vote because they represented their respective board members and were present for the entire hearing.

who have investigated should not then adjudicate," and a court facing special facts and circumstances in a particular case may determine that dual roles are impermissible. *Id.* at 51–58, 95 S.Ct. at 1466–70, 43 L.Ed.2d at 726–29. Agency officials or members who adjudicate a matter are presumed to be honest, fair, and unbiased. A party challenging the combination of investigative and adjudicative functions must convince the court that, under a realistic appraisal of psychological tendencies and human weakness, conferring both functions on the same individuals poses such a risk that it is likely to violate due process. *Id.* at 47, 95 S.Ct. at 1464, 43 L.Ed.2d at 724.

While *Withrow v. Larkin* established the parameters of due process safeguards in administrative proceedings under the federal constitution, Article I, Section 22 of our constitution explicitly addresses procedural due process in such proceedings. Section 22 provides for notice, an opportunity to be heard, an impartial adjudicator, and judicial review. We have recognized that Section 22 is an additional guarantee of important due process rights, enacted in 1970 as legislators and judges noticed the increasing prevalence and influence of administrative agencies in daily life. *See Ross v. Medical Univ. of South Carolina,* 328 S.C. 51, 492 S.E.2d 62 (1997).

In *Ross,* we found the purpose of Section 22 "is to ensure adjudications are conducted by impartial administrative bodies. Partiality exists where, among others, an adjudicator has *ex parte* information as a result of prior investigation or has developed, by prior involvement in the case, a 'will to win.'" *Id.* at 69, 492 S.E.2d at 72. We did not find a violation of Section 22 where the university's president investigated a tenured professor's conduct, terminated the professor, and then testified against him at a committee hearing. The president did not later participate as an adjudicator, and he did not improperly consider *ex parte* information. *Id.* However, we did find a violation of Section 22 where a university vice-president investigated the professor's case, testified as an adverse witness at a committee hearing, and sat as the intermediate judge in a three-step disciplinary procedure. *Id.* at 70, 492 S.E.2d at 72.

We hold that Facility violated Article I, Section 22 because the same persons served as prosecutor and adjudicator. We

disagree with Facility's effort to ignore the Operating Committee meeting, which obviously was part of the investigative and prosecutorial processes because the Garris matter was referred to it. When all three committee meetings are considered, it is clear that five Governing Board members and one non-member attended, as a member or observer, one or more committee meetings at which the Garris matter was discussed extensively in open and executive sessions. At only one of those committee meetings was Garris given a chance to respond. All five members and the one non-member later sat as adjudicators and voted to revoke Garris's status as a designated agent.

We also disagree with Facility's effort to describe the process as one in which Governing Board members were "merely exposed" to the charges and facts of the case. Kepley's attempt to give a fellow board member his proxy to vote in favor of revoking Garris's status plainly shows that at least one member had formed an opinion before the hearing. But Kepley's action, while relevant and revealing, is not primarily what leads us to conclude that Garris did not receive procedural due process because members or officials of an agency who adjudicate a matter are presumed to be honest, fair, and unbiased. *See Withrow v. Larkin, supra; City of Alma v. United States,* 744 F.Supp. 1546, 1561 (S.D.Ga.1990) (an agency official is not deemed unfit to perform her statutory duty merely because she previously has taken a position on issues related to the case before her, even if she expressed her opinion publicly).

Instead, what leads us to conclude that Garris did not receive procedural due process is the inherently flawed structure of the investigative and prosecutorial processes that placed future adjudicators in situations where they had the opportunity to form such premature opinions. Although Hobbie may have been the only committee member who actually *voted* both for the investigation to continue *and* to revoke Garris's status as a designated agent, the other five members heard and engaged in extensive debate about Garris's case in committee meetings before the hearing. We agree with the circuit court that Governing Board members were intimately involved in the investigative and prosecutorial processes as committee members.

We further agree with the circuit court's decision to reject as incredible the testimony of Governing Board members who insisted they either could not remember committee discussions or based their decision solely on evidence presented at the hearing. Allowing an agency official or board member to sidestep Article I, Section 22 merely by stating, in rote fashion, that he or she based a decision only on evidence presented at the hearing would render the constitutional prohibition a nullity.

In short, under a realistic appraisal of psychological tendencies and human weakness, we conclude that Governing Board members who participate in the investigation or prosecution of a designated agent as a member or observer at a committee meeting may not participate as adjudicators of that agent's case at a subsequent hearing. Members who participate in the investigation or prosecution of a case must distance themselves from the adjudicatory process, and should refrain from even discussing that case with future adjudicators. *See Withrow v. Larkin, supra.* Such a rule will reduce or eliminate adjudicators' exposure to *ex parte* information, as well as the inevitable human tendency to develop a will to win. *See Ross v. Medical Univ. of South Carolina, supra.*

Our view is consistent with the approach taken by most courts today. Courts generally discourage agency staff and members from simultaneously acting as investigator, prosecutor, and judge.[4] "It is proper to have some blend of judicial and prosecutorial functions in an administrative proceeding, provided that the person performing the quasi-prosecutorial function is not a member of the decision-making body." *Waste Mgt. v. Pollution Control Bd.,* 175 Ill.App.3d 1023, 125 Ill.Dec. 524, 530 N.E.2d 682, 694 (1988). *Accord Babcock Center, Inc. v. Office of Audits,* 286 S.C. 398, 334 S.E.2d 112 (1985) (holding that administrative agency may adjudicate appeals by panels composed of other persons within the same

---

4. The United States Supreme Court in *Withrow v. Larkin* and other courts have noted that the federal Administrative Procedures Act prohibits agency staff from serving in dual roles, but specifically exempts agency board members from that prohibition. *E.g., Blinder, Robinson and Co. v. SEC,* 837 F.2d 1099, 1104–07 (D.C.Cir.1988) (citing 5 U.S.C.A. § 554(d) (1996)). Article I, Section 22, of our constitution contains no such distinction between agency staff and board members.

agency who did not participate in investigative or prosecutorial capacities); 4 Stein, Mitchell, and Mezines, *Administrative Law,* § 33.02[1] to [4] (1998) (discussing separation of functions and stating that such conflicts can easily be avoided by isolating agency personnel or board members into investigatory, prosecution, and adjudicatory positions).[5]

## C. HARMLESS ERROR

■ Facility contends any error in the handling of Garris's case, including bias by persons not serving as adjudicators and exposure by adjudicators to committee activities, is harmless error and provides no basis for reversing the board's decision. We disagree.

In *Ross v. Medical Univ. of South Carolina, supra,* we found the vice-president's participation as an investigator, witness, and intermediate judge to be harmless error because the university's board independently reviewed the record of the committee hearing, heard oral arguments from the parties, and conducted its own deliberations. *Id.,* 328 S.C. at 70, 492 S.E.2d at 72.

In this case, the Governing Board acted as the final adjudicator in Garris's case. Five members and one-non member participated as members or observers in prior committee meetings where Garris's case was extensively discussed. Those six persons sat in judgment of Garris at the hearing and cast six of the eight votes to revoke his status as a designated agent. We conclude the structure of the proceeding in this case was so inherently flawed that it is not subject to harmless

5. See also *Pope v. Mississippi Real Estate Comm'n,* 695 F.Supp. 253, 285 (N.D.Miss.1988) (finding no due process violation where staff investigated a real estate agent, a commissioner from outside the agent's district decided whether the case should go forward, and the commissioners who heard and decided the case did not participate in the investigation), *aff'd,* 872 F.2d 127 (5th Cir.1989); *Ridgewood Properties, Inc. v. Dep't of Community Affairs,* 562 So.2d 322 (Fla.1990) (finding violation of state and federal due process where department head testified in an administrative hearing and later reviewed the hearing officer's order); *Manka v. Tipton,* 805 P.2d 1203, 1206 (Colo. Ct.App.1991) (upholding decision in tax case decided by deputy director in administrative hearing where taxpayer presented no evidence that director investigated the case); 73A C.J.S. *Public Administrative Law and Procedure* § 138(c) (1983); 2 *Administrative Law* § 313 (1994); West's Digests, *Administrative Law,* Key No 445.

error analysis. *Cf. Arizona v. Fulminante,* 499 U.S. 279, 307–09, 111 S.Ct. 1246, 1263–64, 113 L.Ed.2d 302, 329–31 (1991) (dividing constitutional errors into "trial errors" and "structural defects," with the latter defying analysis by harmless error standards because they affect the framework within which a trial proceeds, rather than simply an error in the trial process itself); *State v. Byrd,* 318 S.C. 247, 456 S.E.2d 922 (Ct.App. 1995) (same).

In sum, we conclude Facility is an administrative agency, the same persons served as both prosecutors and adjudicators in violation of Article I, Section 22, and the process was so inherently flawed that it is not subject to harmless error analysis.

## 2. *RES JUDICATA*

 Garris, in a declaratory judgment action brought after Facility filed the notice and rule to show cause, sought to enjoin Facility from proceeding against him. Garris filed a notice of appeal and a petition for supersedeas after the circuit court denied relief. We declined to stay the proceeding before the Governing Board, but stayed review of any disciplinary action which adversely affected Garris's status as a designated agent pending judicial review of the Governing Board's decision. We ultimately affirmed the circuit court, holding that Garris must first exhaust his administrative remedies. We also addressed Garris's argument, holding that the APA does not require Facility to give him time to correct any deficiencies, but only requires Facility to give him an opportunity to show he had complied with the law. *Garris v. Governing Board of South Carolina Reinsurance Facility,* 319 S.C. 388, 461 S.E.2d 819 (1995) *(Garris I ).*

In his petition to the circuit court following the Governing Board's decision to revoke his status as a designated agent, Garris argued the composition of the board is unconstitutional under Article III, Section 1 of the state constitution.[6] The

---

6. Article III, Section 1, states:

The legislative power of this state shall be vested in two distinct branches, the one to be styled the "Senate" and the other the "House of Representatives," and both together the "General Assembly of South Carolina."

circuit court ruled the argument was barred by the doctrine of res judicata. Garris contends the circuit court erred because res judicata does not bar his argument. We agree.

■■■ "Res judicata bars a subsequent suit by the same parties on the same issues. Res judicata is shown if (1) the identities of the parties is the same as a prior litigation; (2) the subject matter is the same as the prior litigation; and (3) there was a prior adjudication of the issue by a court of competent jurisdiction." *Johnson v. Greenwood Mills, Inc.,* 317 S.C. 248, 250, 452 S.E.2d 832, 833 (1994) (citations omitted). "A litigant is barred from raising any issues which were adjudicated in the former suit and any issues which might have been raised in the former suit." *Hilton Head Center of South Carolina, Inc. v. Pub. Service Comm'n of South Carolina,* 294 S.C. 9, 11, 362 S.E.2d 176, 177, (1987); *see also* James F. Flanagan, *South Carolina Civil Procedure* 649–55 (1996) (explaining three basic tests used in res judicata analyses). The primary purposes of the doctrine, commonly known today as claim preclusion, are to bring an end to litigation and prevent a defendant from being forced to defend the same action repeatedly. *See* 50 C.J.S. *Judgment* §§ 697, 702 (1997).

Res judicata or claim preclusion, however, is not always an ironclad bar to a later lawsuit.

A valid and final personal judgment for the defendant, which rests on the prematurity of the action or on the plaintiff's failure to satisfy a precondition to suit, does not bar another action by the plaintiff instituted after the claim has matured, or after the precondition has been satisfied, unless a second action is precluded by operation of the substantive law.

Restatement (Second) of Judgments § 20(2) (1982). *Accord Allen v. Southern Ry. Co.,* 218 S.C. 291, 62 S.E.2d 507 (1950) (plaintiff's voluntary dismissal of first action leaves situation as though no suit had ever been brought; subsequent, nearly identical action is not barred by res judicata even though plaintiff appealed first action to Supreme Court, which held that voluntary dismissal was inappropriate and premature); *Gault v. Spoon,* 168 S.C. 160, 167 S.E. 229 (1932) (where first action did not proceed to a conclusion because it was dismissed for failure to execute a proper bond, res judicata did not bar

subsequent action on same transaction). *See also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S.Ct. 2447, 2456, 110 L.Ed.2d 359, 376 (1990) (a dismissal without prejudice is not an adjudication upon the merits and does not have res judicata effect); *McEachern v. Black*, 329 S.C. 642, 496 S.E.2d 659 (Ct.App.1998) (same).

Furthermore, dismissal of a prior lawsuit without prejudice, on the ground that a party failed to exhaust administrative remedies, does not mandate dismissal of an identical cause of action in a subsequent suit. *Bowden v. United States*, 106 F.3d 433, 441 (D.C.Cir.1997); Wright, Miller, & Cooper, *Federal Practice and Procedure*, § 4437 (1981). "When applying res judicata to causes of action that were not before the court in the prior action, due process of law and the interest of justice require cautious restraint. Restraint is particularly warranted when the prior action was dismissed on procedural grounds." *Kearns v. General Motors Corp.*, 94 F.3d 1553, 1556 (Fed.Cir.1996) (concluding res judicata did not bar patent infringement claims that were not before court in earlier case dismissed by court).

The doctrine of res judicata does not bar Garris's argument raising Article III, Section 1 because he could not properly have raised it or any other arguments before exhausting his administrative remedies. The fact the Court chose to address one of his arguments in a premature appeal does not mean he now should be penalized for not raising every purely legal challenge in that premature appeal. The purposes of res judicata—bringing an end to litigation and preventing a defendant from being forced to defend the same action repeatedly—are not met by applying the rule in this case. We remanded the matter in *Garris I*, which meant the proceedings against Garris continued and Facility had to continue its involvement in the matter. Accordingly, we reverse the circuit court's ruling on this issue.

### 3. ARTICLE III, SECTION 1

The circuit court, in the interest of finality, ruled on the merits of Garris's argument and found that the statute establishing the composition of the Governing Board unconstitutionally delegates legislative appointment power to private

organizations. Facility contends the circuit court erred. We disagree.

The director of the Department of Insurance must appoint six of the insurance industry representatives on the Governing Board from lists of nominees prepared by and drawn from the American Insurance Association (two members), the American Mutual Insurance Alliance (two members), and the National Association of Independent Insurers (two members). *See* S.C.Code Ann. § 38–77–580 (Supp.1997).

We affirm the circuit court's ruling and hold that the delegation in Section 38–77–580 of the Legislature's appointive powers to private organizations violates Article III, Section 1. *See Toussaint v. State Bd. of Medical Examiners,* 285 S.C. 266, 329 S.E.2d 433 (1985) (striking down statute which required Governor to select board members from list of nominees submitted by private association, where those nominees by statute had to belong to the private association); *Gold v. South Carolina Bd. of Chiropractic Examiners,* 271 S.C. 74, 245 S.E.2d 117 (1978) (same); *see also Hartzell v. State Bd. of Examiners in Psychology,* 274 S.C. 502, 265 S.E.2d 265 (1980) (upholding a statute which required Governor to select board members from a list of nominees submitted by private association, where statute did *not* require those nominees to belong to the private association).

Facility, attempting to distinguish *Toussaint* and *Gold,* argues the *entire* Governing Board is not drawn from the membership of private associations that include only a portion of a particular type of professionals. It is true that Governing Board includes other members, including four consumer representatives, two insurer representatives who are not association members, four producer representatives, and two designated agent representatives. However, that does not change the fact that, in establishing a method to choose six of the insurer representatives, the Legislature unconstitutionally delegated its appointive powers to private organizations.

## 4. EXERCISE OF PROXIES

Facility's plan of operation requires that a quorum of eleven members be present for a vote, and an action is binding when approved by the majority of those present. The director

of the Department of Insurance may provide for voting by proxy at meetings. S.C.Code Ann. § 38–77–580 (Supp.1997). Governing Board Chairman John Richards initially counted proxies in determining whether a quorum was present at the Garris hearing. Richards ruled that only those members and proxy holders who had been physically present for the entire three-day hearing could vote on the matter. He later applied that same rule in determining whether a quorum was present.

Nine board members [7] and two proxy holders [8] were eligible to vote under the rule, i.e., they were present in person during the entire hearing. In addition, two other nonvoting board members [9] were present during the entire hearing. Five other board members were present only by proxy.[10]

The circuit court ruled that a quorum was present either in person or by proxy during the entire hearing, the nonvoting members could be counted for purposes of a quorum, and the proxies held by Larry Griner and Nancy Coombs were properly exercised.

Garris contends the circuit court erred because allowing proxy holders Griner and Coombs, who were not board members, to vote violated Garris's due process rights and was inherently unfair. While proxy holders may vote at "routine" meetings, the Court should not allow them to vote in important cases such as this one which have constitutional implications, he argues. Under that reasoning, every member could have given his or her proxy to a file clerk, who could then have decided his case, Garris argues. Furthermore, because Griner and Coombs could not vote, they also could not be counted for purposes of a quorum, Garris asserts. That means there was no quorum of eleven, he contends. We disagree.

---

7. Steve Dennis, Jim Thompson, Robert Herlong, Clark Hobbie, Phillip Love, Gerry Huckaby, Chairman John Richards, David Rowell, and W.R. Braddy.

8. Larry Griner, who exercised the proxy of board member Randall Thompson; and Nancy Coombs, who exercised the proxy of board member Philip Porter.

9. Thomas Reichard and Frank Lee.

10. Thomas Kepley, C.M. Dinwiddie, James Lingle, Arthur Ivey, and Bob Taylor.

The persons legally responsible for an administrative agency's decision must be informed and unbiased, must hear the case, and must in fact make the decision. *Flav–O–Rich, Inc. v. NLRB,* 531 F.2d 358, 362 (6th Cir.1976); *KFC Nat'l Mgt. Corp. v. NLRB,* 497 F.2d 298, 304 (2d Cir.1974). Due process requires an administrative board, when acting in a quasi-judicial capacity, to consider all the evidence before deciding a particular question. This does not mean, however, that the administrative board must itself hear the evidence. Staff or assistants may prepare and present the evidence, which the administrative board must consider when rendering its decision. *Pettiford v. South Carolina State Board of Educ.,* 218 S.C. 322, 346, 62 S.E.2d 780, 791 (1950) (approving procedure in which two board members heard testimony and reported it to full board, which decided the matter). It is important, of course, that decision makers attend the hearing if possible. *See McCoy v. Easley Cotton Mills,* 218 S.C. 350, 357, 62 S.E.2d 772, 775 (1950) (stating in workers' compensation case that "[o]rdinarily oral argument is of much aid to any judicial or quasi-judicial body in reaching a proper conclusion, [and] [o]nly circumstances of the most urgent nature are sufficient to excuse a member's absence").

In the absence of any statutory or other controlling provision, the common-law rule that a majority of a whole board is necessary to constitute a quorum applies, and the board may do no valid act in the absence of a quorum. *Prosser v. Seaboard Air Line R. Co.,* 216 S.C. 33, 44, 56 S.E.2d 591, 595 (1949); *Gaskin v. Jones,* 198 S.C. 508, 513, 18 S.E.2d 454, 456 (1942). A member who recuses himself or is disqualified to participate in a matter due to a conflict of interest, bias, or other good cause may not be counted for purposes of a quorum at the meeting where the board acts upon the matter. *Talbot v. James,* 259 S.C. 73, 82, 190 S.E.2d 759, 764 (1972); *King v. New Jersey Racing Comm'n,* 103 N.J. 412, 511 A.2d 615, 618 (N.J.1986).

We affirm the circuit court's ruling and hold that proxy holders Griner and Coombs appropriately participated in the Garris matter. Griner was employed by same insurer who employed Randall Thompson, the board member whose proxy he held. Coombs, a staff attorney at the Department of

Consumer Affairs, held the proxy of Consumer Advocate Philip Porter. Due process does not require that only Governing Board members hear a designated agent's case. *See Pettiford, supra.*[11]

Garris's reliance upon *Flav–O–Rich, supra,* and *KFC National Management, supra,* is misplaced because those cases are easily distinguished on the facts. In *Flav–O–Rich,* the court held the National Labor Relations Board could not delegate its authority to decide motions to the board's chief counsel. In *KFC National Management,* the court held that allowing one board member and two attorney assistants, who held the general proxies of the other two board members, to decide petitions for review violated the National Labor Relations Act and administrative due process. Drawing upon those cases, Garris presents a hypothetical about all Governing Board members handing over their proxy to a clerk. While his hypothetical might present due process problems, that is not what happened in this case.

We further conclude the circuit court correctly ruled that a quorum was present. The record shows that eleven members, including Griner and Coombs, were present in person for the entire hearing. Enough members were present in person to form a quorum without even considering the five other board members who had given their proxy to fellow board members.

## CONCLUSION

We affirm the circuit court's ruling on Issue 1 that the procedure employed by Facility in this case violated Article I, Section 22 of the state constitution. We reverse the circuit court's ruling on Issue 2 that the doctrine of res judicata barred Garris's argument about the composition of the Governing Board. We affirm the circuit court's ruling on Issue 3 that the statute establishing the composition of the Governing Board violates Article III, Section 1 of the state constitution. We affirm the circuit court's ruling on Issue 4 that proxies

---

11. Griner's participation as a proxy holder was appropriate. His participation as an observer at the three committee meetings and as an adjudicator at the hearing was not appropriate, as explained in Issue 1. Neither Coombs nor Porter attended the committee meetings.

were properly exercised and a quorum was present at Garris's hearing before the Governing Board.

We remand this case to Facility for further proceedings consistent with this opinion. Our disposition of the issues renders it unnecessary to address Garris's remaining arguments.

FINNEY, C.J., TOAL, MOORE and BURNETT, JJ., concur.